FOUT v DIETZ

1. Automobiles—Owner's Consent—Presumptions—Family Members.

A person who is driving another's automobile and who is not a member of the owner's family is not presumed to be driving with the express or implied consent of the owner, although consent is inferred.

2. Automobiles—Owner's Consent—Family Members—Presumptions.

A party seeking to hold the owner of an automobile, which is driven by another person, liable for damages must establish that the driver had the owner's permission to use the automobile where the driver is not a member of the owner's family; after such permission is established, a presumption exists that the driver was operating the vehicle with the express or implied consent of the owner.

3. Automobiles—Owner's Consent—Implied Consent.

An automobile owner's consent to the use of his automobile by another cannot be implied where the driver had not previously used the automobile, the driver took the keys from the owner's room without the owner's knowledge, the driver divulged his involvement in an accident to the owner some hours later and the two discussed the matter at some length before deciding to report it to the police, and where the owner subsequently discussed with the police the possibility of making a complaint concerning the unauthorized use.

Appeal from Alpena, Philip J. Glennie, J. Submitted February 2, 1977, at Grand Rapids. (Docket Nos. 28087, 28207.) Decided April 19, 1977. Leave to appeal applied for.

Complaint by Barbara Fout, administratrix of

Reference for Points in Headnotes
[1–3] 8 Am Jur 2d, Automobiles and Highway Traffic § 605.

the estate of Robert Fout, deceased, against Daniel Dietz, Citizens Mutual Insurance Company, Michigan Mutual Insurance Company, the Secretary of State, Ronald Bredow, and Auto-Owners Insurance Company, for a declaratory judgment regarding the applicable insurance coverage in an automobile-pedestrian accident in which Robert Fout was fatally injured. Judgment in favor of defendants Michigan Mutual and Secretary of State. Citizens Mutual appeals. Ronald Bredow and Auto-Owners appeal separately. Appeals consolidated by the Court of Appeals. Reversed. .

*Gillett & Carpenter,* for Citizens Mutual Insurance Company.

*Dreyer & Braeuninger* (by *Steve R. DuBois),* for Ronald Bredow and Auto-Owners Insurance Company.

*Murchie, Calcutt & Sondee,* for Michigan Mutual Insurance Company.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Joseph B. Bilitzke* and *Carl K. Carlsen,* Assistants Attorney General, for the Secretary of State.

Before: R. B. BURNS, P. J., and BASHARA and QUINN, JJ.

BASHARA, J. This appeal arises from a declaratory judgment holding that defendant Daniel Dietz drove defendant Ronald Bredow's auto with Bredow's implied consent at the time it was involved in an auto accident. The accident resulted in the

death of plaintiff's husband.[1] The facts, as developed by deposition and at trial, are crucial to our determination.

Dietz had known Bredow for about one month prior to September 29, 1973, the date of the accident. Dietz was 17 years old and Bredow 20. While Dietz lived with his parents, he remained overnight at Bredow's on prior occasions. Dietz had been residing at Bredow's, along with two of Bredow's cousins, for four nights prior to September 29. He slept on the living room couch.

Bredow had purchased a 1974 Chevrolet Nova two months prior to the accident. Bredow's cousin Daniel Marquardt had driven Bredow's car on one occasion prior to Bredow's acquaintance with Dietz. The testimony is unrebutted that Bredow had specifically indicated no one was to drive his car, with the exception of Marquardt, who had only done so on the one occasion previously mentioned.

On the evening of September 28th,[2] Bredow and Dietz attended a party where large quantities of intoxicants were consumed. They returned to Bredow's at about 3 a.m. in an apparently inebriated condition. Bredow immediately went to sleep in his room. Dietz stayed in the living room and listened to music.

Shortly before the accident, which occurred between 6:30 and 7 a.m., Dietz went to Bredow's room and took the keys to the Nova from the

[1] Following the decision of the trial court, based on plaintiff's suit for declaratory judgment (GCR 1963, 521), defendants Auto-Owners Insurance Company and Ronald Bredow, their insured, and Citizens Mutual Insurance Company, insurer of the father of defendant Dietz, each pursued separate claims of appeal. (Record). These appeals, raising the same issue and based on the same decision in the court below, are consolidated.

[2] The trial judge's opinion finds that the date of the party was July 28th. We assume this is inadvertent.

dresser. He left with the auto, apparently to obtain food. While on his way, Dietz passed the Fout car, which was disabled and being pushed by the decedent. He stopped to offer assistance but the gesture was refused. He proceeded to highway M-32. Once there, he became concerned that Bredow would be upset upon learning that he was using the car without permission. He turned around and retraced his route to Bredow's residence. As he was returning, he struck plaintiff's husband, mortally injuring him. Dietz did not stop but proceeded directly to Bredow's, arriving between 7 and 8 a.m.

Soon after Dietz returned Bredow awoke. There is a conflict in the testimony as to whether Dietz informed him that he had struck someone. However, the damage to the car was evident to Bredow, and Dietz admitted taking it. Later that day Bredow drove Dietz and his cousin to a grocery store near the cottage. The storekeeper informed them a man had been injured that morning in a hit-and-run accident. Dietz admitted to Bredow that he might have been the driver.

After riding around discussing the matter for a few hours, they drove to the Alpena police station to report the incident. They were informed the state police were handling the matter and were told to report to them. They did so. Bredow's car was impounded and the next day Dietz was charged with manslaughter.

At least one day later, Bredow returned to inquire about his auto. He sought to file a stolen car report, but after discussion with a state police officer decided not to proceed further.

The trial court, sitting without a jury, made findings of fact and conclusions of law pursuant to GCR 1963, 517.1. The trial judge found that under

the owner's liability statute, MCLA 257.401; MSA 9.2101, the operator of a motor vehicle is presumed to be operating the vehicle with the express or implied consent of the owner. He further found that there was no credible proof to rebut the presumption that the auto was being driven with Bredow's implied consent.

We must first consider whether the trial judge was correct in determining that one who is not a relative is statutorily presumed to be operating a vehicle with the express or implied consent of the owner. MCLA 257.401; MSA 9.2101 provides in pertinent part as follows:

"The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of such motor vehicle whether such negligence consists of a violation of the provisions of the statutes of the state or in the failure to observe such ordinary care in such operation as the rules of the common law requires. The owner shall not be liable, however, unless said motor vehicle is being driven with his or her express or implied consent or knowledge. *It shall be presumed* that such motor vehicle is being driven with the knowledge *and consent of the owner if it is driven at the time of said injury by his or her father, mother, brother, sister, son, daughter, or other immediate member of the family* * * * ." (Emphasis supplied.)

It is clear that the statute itself only applies the presumption to family members. Appellees concede as much by arguing that the presumption is not statutory but arises out of the common law. Is there a common law presumption of implied consent to one not a family member?

All parties point to the venerable case of *Hatter v Dodge Brothers,* 202 Mich 97; 167 NW 935 (1918), in support of their respective positions. It

seems to this Court that *Hatter* was clear in its pronouncement:

"This act takes special cognizance of recognized rules of evidence upon implications and presumptions arising from proven facts as proper and legitimate in establishing the responsibility of the owner of an automobile for injuries resulting from its negligent operation by another. It recognizes the difficulty to the injured party of securing direct proof in an automobile accident that the use by another is authorized by the owner and makes plain that fact may be presumptively or impliedly shown by proven facts from which it can be reasonably inferred. The permissible presumptions arising from proven facts are either conclusive, or disputable and open to rebuttal. If the automobile was being driven by specified relatives or immediate members of the owner's family the presumption that its use was authorized by him is made conclusive by the statute. It is an intendment of the law which he may not deny or contravene by other evidence, direct or indirect.

In the absence of such statutory qualification the possession, use and control of an automobile in a public place fairly gives rise to the *inference* that the person so in control is the owner of such property or in lawful possession of it with the express or implied consent of the owner. By statute it is made a felony to take possession of and use a motor vehicle without authority. (3 Comp. Laws 1915, § 15431; Act No. 220, Pub. Acts 1917), and the presumption of innocence, in the absence of proof to the contrary, attends the driver. Unexplained and undisputed, *the reasonable inference of consent by the owner and authority of the driver is such as common sense and common experience usually draws and applies to the possession of those driving automobiles along our highways.*" (Emphasis supplied.) 202 Mich at 102.

Appellees assert that *Monaghan v Pavsner,* 347 Mich 511; 80 NW2d 218 (1956), provides that the presumption applies to an outside-the-family driver as well. However, *Monaghan* was decided by

an equally divided court. It is true that Justice
BLACK, speaking for four of the justices, stated the
above proposition. It is also true that Justice
SHARPE, on behalf of an equal number, stated that
the burden or proving consent, either express or
implied, rests with the plaintiff.

This language more nearly squares with the
recent case of *Roberts v Posey,* 386 Mich 656; 194
NW2d 310 (1972). There, defendant lent his car to
another with instructions to return it by a certain
time. The borrower kept the car well past the
stated time and was involved in a collision after it
was due back to the lender. Justice T. E. BRENNAN,
in an unanimous opinion, stated that:

"[A]n evidentiary presumption of statutory consent or
knowledge of the driving arises upon proof of permis-
sion to use the car.
    *"Once the fact of permission to use the vehicle is
established,* the burden is on the owner to show that
the vehicle was not thereafter being driven with his
express or implied consent or knowledge." (Emphasis
supplied.) 386 Mich at 663.

See also *Cowan v Strecker,* 394 Mich 110; 229
NW2d 302 (1975).

It thus appears that there is no initial presump-
tion that one who is driving an auto and is not a
member of the family does so with the express or
implied consent of the owner. There is an infer-
ence to that effect. Permission for an out-of-the-
family driver to use the vehicle must be estab-
lished by the plaintiff. Thereafter, whatever occurs
as a result of the use of the vehicle, a presumption
exists that the driver is operating with the express
or implied consent of the owner.

Did Ronald Bredow give Daniel Dietz permission
to use his auto? Clearly there is no record support

for such a finding. Findings of the trial court say as much. Could such consent be implied? Contrary to the findings of the trial judge, we think not.

The fact that Dietz had been staying overnight at Bredow's cottage could not carry with it an implied consent to use Bredow's auto. Bredow allowed his cousin to use the car on one occasion prior to any familiarity with Dietz. This cannot imply consent to Dietz.

We are, frankly, hard put to understand how leaving one's keys on a dresser in one's own room, not assigned to anyone else, implies permission to take them. In point of fact Bredow's keeping them in his own room rather than the living room, where Dietz was staying, or some other common room, implies just the opposite.

The court's opinion makes much of the fact that Bredow, upon discovering that his car had been involved in an accident, drove around with Dietz until 5 p.m. before reporting it. The only testimony as to when Bredow discovered that his car was involved in an accident which killed a man came from Bredow himself. He stated that it was about 2 p.m. on September 29th. The trial judge indicated that the time was noon. Whether Bredow and Dietz drove around deciding what to do for three hours or five hours seems to us immaterial.

The fact of the matter is that a 20 year old, after discovery, confronted a 17 year old with a situation which was obviously grave, and it was decided to report to law enforcement officials. It is difficult to fathom how permission to drive Bredow's auto, either express or implied, is extracted from this action.

Finally the trial court found that Bredow made no effort whatsoever to make a complaint concern-

ing Dietz's unauthorized use. However, Bredow did indicate that he discussed the matter with the state police the following day. Trooper Boyer of the state police corroborated Bredow's testimony. He stated the following in a colloquy with the attorney for the Secretary of State:

"Q You talked to Mr. Bredow at the Post. Was that the day following the accident?

"A I'm not sure. It was at least the day after. It was not the day of the accident.

"Q It wasn't the day of the accident?

"A No. sir, it was not.

"Q At that time do you recall whether he made any complaint to you about whether his car was being used with or without his permission on that day of the accident?

"A Not sure how the particular subject come up, but it did come up. He did state that he wanted to make a stolen car report. I explained to him just what it involved, and after explaining this to him, he changed his mind and decided not to do it.

"Q Now, you say you explained to him. Could you tell us in detail what your explanation would have consisted of or—

"A I don't know if I can do it in detail but I can do it the best I can.

"Q Best of your recollection.

"A I informed him that after taking the information from him I'd have to go to the prosecutor and the prosecutor would have to make the final decision whether a warrant would be issued for 'joyriding', a stolen vehicle, or whatever, Then, if a warrant were issued, Danny Dietz would be picked up and subsequently charged on the charge on the warrant. After this was done, Ron decided that he did not want to press charges."

Reviewing the only evidence proffered at trial, we must respectfully disagree with the trial

judge's conclusion that Bredow made no effort whatsoever to make a complaint concerning Dietz's unauthorized use.

Taking all of the facts into consideration, it is our opinion that the testimony adduced clearly rebuts any inference that Dietz used Bredow's auto with his express or implied consent when the vehicle was involved in the accident that fatally injured Mr. Fout.

Reversed. Costs to defendants.